Good morning, and may it please the Court. Christopher Passage with McGuire Woods on behalf of Plaintiff Appellant Cachet Financial Services, and I would like to reserve two minutes for rebuttal. The issue posed to this Court essentially boils down to one core question. Have the insurers in this case established that their interpretation of the two exclusions at issue is reasonable in the context of the language of the policies we have before us here today? They have not. Cachet has presented reasonable interpretations of both of the two undefined phrases in the exclusions at issue today. With respect to the fraudulent instructions exclusion, it is reasonable to interpret instructions which prove to be fraudulent to simply mean fraudulent instructions. With respect to the authorized access exclusion, it is reasonable to limit authorized access to Cachet's computer system to mean access to Cachet's internal systems, not the mere ability to upload data to Cachet's systems. And not only are Cachet's interpretations reasonable in a vacuum, but when read in context of the policy, the insurers cannot meet their burden at this stage on the pleadings to establish that they have the only reasonable interpretation of those two policies. With respect to the fraudulent instructions exclusion, we want to look in terms of California law. California coverage interpretation law requires us, as I mentioned, to look first to the language of the contract and to review that policy language in the context of the contract. And that is said in Civil Code 1641. That goes back to cases like J. Lamb. That goes back to the California Supreme Court's case in Bank of the West, which says the court must interpret the language in context with regards to its intended function in the policy. And here, there are a few different signposts we can look at to see what is the meaning of instructions which prove to be fraudulent in the language of the policy itself. The first is a simple, plain, logical layperson view. Instructions which prove to be fraudulent should mean fraudulent instructions. It's not a hard switch to get there. The second thing to note is that this phrase is not defined in the policy. Instructions which prove to be fraudulent is not defined. Instructions, as a word standing alone, is not defined. Third, you look to the title of this exclusion itself, which is, again, a fraudulent instructions exclusion. A layperson looking at this title would necessarily reasonably expect that this exclusion would be directed to cover fraudulent instructions. But it goes a little bit beyond that as well. What do we do about the use of quotation marks elsewhere, though? So there are no quotation marks in that heading. But elsewhere, financial instruction is, or fraudulent instruction is in quotes. Well, I think there are a couple different things that I would say in response to that. First, Your Honor, we can have questions as to what is, what are other reasonable interpretations, right? So the insurers have argued, repeatedly argued, that this should be meaning a broader thing. So it should be something broader than the defined term here. The problem is, it's not unreasonable for a layperson who's looking at this language to say, well, it's an instruction which proves to be fraudulent. That's a fraudulent instruction. When you look at that, and that's why the context is important here, when you look at that language, it would be reasonable to look at that and have it, understand that to mean same type of thing as what we have in the defined term of fraudulent instruction. Which defined, which defined term? Let's just assume for a moment that we accept your argument that the defined term, the fraudulent instruction definition, applies to the exclusion. There are two definitions, one under A6A2 and one under A6B. Correct. Which one applies? And let me just ask a second part to this question, which is because there are two definitions, and you're suggesting that it applies, but the fact that we wouldn't know even as between those two which one to apply, doesn't that sort of run counter to your argument that the defined term should apply when it's not clear to me which one? Not quite, Your Honor. And here's what I'd say. First of all, in response to your question, it's both. And there's a reason for that. If you look at the way that the exclusion actually works, the exclusion says that there's no coverage for instructions which prove fraudulent except as provided under insurer agreements A6A2 and A6B. So effectively, and this is something the insurers actually raise throughout their briefing below, they call this sort of a funneling exclusion, right? So coverage for fraudulent instructions is sort of funneled into A6A2 and A6B. Well, this interpretation actually gives light to that sort of funneling effect that we have here. Because when you limit coverage under A6A1 to exclude things that are specifically fraudulent instructions, that ensures that the only way that you can get coverage for something that's a fraudulent instruction, assuming you meet the other confines of the insurer agreement, is under A6A2 and A6B. That's why this definition is important here. It's because it renders that consistency there in place. You can actually look at other places in the policy where this type of cause and effect is placed. I believe if you're looking at insurer agreement A6-1 in the policy, that's an insurer agreement for employee theft. So it talks about theft committed by, among other things, employees. Give me a moment. I can give you a pin site if that would be necessary for the record. But you have insurer agreement A6 or A1. I have it in front of me. I think it's at ER. Correct. Okay. Yeah. It says we will pay for loss or damage to money, securities, other property resulting directly from theft committed by an employee. So that's a theft insurer agreement. Now, compare that with one of the exclusions that comes into play when we'll discuss the authorized access exclusion. It's exclusion D1C. And that's on, it's on ER 400. I know it's a couple other places in other versions of policy we have here, all the same policy. But that is an exclusion for loss resulting from theft committed by any of your employees, among other things there. So again, there's an exception here. It says except when covered under insurer agreement A1. Now, what's the effect of this? If you have theft, it's covered under A1. But the policy wants to make sure that you don't have that coverage for theft under other insurer agreements. That's the same thing that they're trying to do here with respect to exclusion. At least that's a way you can reasonably interpret that exclusion. You want to have coverage for fraudulent instructions only under A6A2 and A6B. It's separate and distinct from the computer fraud insurer agreement. A6 is the computer and funds transfer fraud insurer agreement. And the parties understand that to mean the computer fraud agreement, which is A6-1. And then you have the funds transfer fraud insurer agreement, which are the other ones. The whole goal, make sure you have fraudulent instructions coverage only under those two insurance agreements. And it's a reasonable interpretation for an insurer to have in that situation. So this is basically your illusory coverage argument. It is not an illusory coverage argument. We have an illusory coverage argument. But at this point, it also, the illusory coverage argument kind of lends credence to the arguments with respect to ambiguity. The insurer's position is that there should be a broad exclusion read to read out any coverage for the batch files that we have at issue here. The problem is, when you look to John's grill, you have to look to an insurer's reasonable expectations as well. And Cachet's reasonable expectations here are not particularly far-fetched. You have a computer fraud insurer agreement. Cachet's business is handling ACH transactions for payroll services companies. Presumably, it would be reasonable to expect the fraud occurring in those transactions by using a computer would be covered. There's a reasonable expectation of coverage for that. And that's where John's grill comes into play. When you have an argument with respect to ambiguity, you have a reasonable interpretation as we presented here. When you have a reasonable expectation of coverage, which the insurers don't truly fight against, they say that reasonable expectations don't come into play unless there is a reasonable interpretation. But they don't make an argument. Then when there is a particular interpretation that would effectively vitiate coverage here, then that interpretation can't be the one that's adopted here. So that's the fraudulent. I'm sorry, Your Honor. I think I'm confused by an answer you gave to Judge Desai earlier. Can you just go back and say, can you explain again, what do you think is giving you the coverage here? Because I think maybe you said something that I don't understand. Oh, I'm sorry. It's the computer fraud insuring gives cachet coverage. And that was what was decided by this court previously in the party's prior appeal. But did you tell her that it's coming from 6A2 and 6B? Because I thought your argument was that it's from 6A1. No. I apologize if I misstated anything. Cachet's coverage from this is solely under 6A1. The court has already found there's no coverage under. That's what I thought. Let me just clarify. My question to you, and I think what you were trying to answer because I asked a compound question, was if we were to apply the definition of fraudulent instruction, there are two of them, one under A6A2 and one under A6B. And I asked which one of those two definitions would apply. And I think your answer is both. Yes, that's correct. Yes. And I'm sorry for the confusion. There are a couple of different moving parts that obviously we're dealing with here. And that assumes, of course, that we agree with you that the fraudulent instruction, you know, separate and apart from the question Judge Friedland asked, which is, you know, why do we assume that the definition even applies when there's quotations? Yeah. I think those are two separate questions. Yes. I apologize. I just want to make sure that that was clear for the record. I want to be clear. Are you saying that the quote fraudulent instructions has different meanings or is there one meaning when it's in quotes? There is one meaning here. And I was is a little bit it kind of lends credence to our argument in our view, obviously. Fraudulent instructions is the definition that is provided for in the policy. Right. So you have the fraudulent instructions definition that is defined within the scope of insuring agreements A6A2 and A6B. Our understanding, our interpretation, what we think is a reasonable interpretation, is that instructions proven to be fraudulent should be interpreted to mean the same thing as fraudulent instructions in this context. This gets back to Judge Friedland's very initial question, I think, which is where a policy is set up to clearly advise the policyholder that there are definitions for this policy. And when we use them, we have quotes around them when it has that. And it uses that throughout the policy as a structural mechanism. Why would we take language that is not in quotes and treat it as though it was? I think there are a few different reasons for that, Your Honor. First of all, again, it goes back to the content context of the policy. And I recognize I'm somewhat repeating myself here with this argument. But when you look at how this policy is used, the goal is going to be to ensure that there is coverage for fraudulent instructions here within the scope of the fraudulent instructions or within scope of the funds transfer fraud insuring agreements only. That's one. Second of all, we're not looking for the only singular interpretation of this provision here. Right. All the cache needs to do is establish that that is a function of what a policy writer is doing when they decide to use defined terms and advise the policyholder that we are doing this. And when we use our defined terms, we'll put quotes around them to bring it to your attention. I mean, there's a provision right at the outset that says this is what we're doing in this policy. Sure. But we would submit, Your Honor, that this is one of those cases where a layperson reads policy. And, you know, we're not talking about sophisticated parties here. We're talking about lay people doing an objectively reasonable interpretation. A layperson can understand this structure of we use language. And, you know, if it's not specified as a definition here, then we give it its reasonable term, reasonable understanding. But we have chosen to define some terms and we'll alert you. We'll signal to you when we're using them and then do that throughout. Why? Why should we assume that a reasonable person can't understand that? Some of the reasons that I've said, I won't repeat the same reasons I've said before, Your Honor, with respect to the context that we discussed previously. But I think one thing you can also look to is the fact that even the insurers in this case, when they're talking about instructions of proof to be fraudulent, reference fraudulent instructions in their prior briefing. The district court, when it was talking about instructions, which proved to be fraudulent, actually referenced fraudulent instructions instead. It's a very simple thing to have an understanding that those two terms should mean the same thing. It gives effect to every other areas in the policy, like the theft insuring agreement in combination with that authorized representative exclusion we discussed. If you look at, for example, different types of interpretations, it may be that their argument is reasonable. It may be that their interpretation is reasonable. We're not conceding that. All we are saying is even if it is, they haven't proven their interpretation is the only reasonable one. If I may briefly get to the authorized access exclusion, I know I'm running a little bit low on time. It's up to you. You can save your time or you can use it. I'll just briefly, with respect to the authorized access exclusion, I think the one thing I would like to say in my limited time is there is a distinction in the policy between entry and access. Use of the system here, the only use of the system that was referenced here, the only thing that was alleged in the complaint was the uploading of batch files into the portal, into the server. That's it. There's no accessing of the internal files there. There's no accessing of the internal mechanisms of the system. What happened here is not access. It is entry. And the authority that the insurers incite all relates to authorized representatives, not authorized access. I'll talk about authorized representatives who are effectively acting in the shoes of the insured. There's one example where somebody was literally retained to be a vice president or be an officer of the company. That is an authorized representative. We do not have that here. It's also buffered by the fact that when you have a authorized representative exclusion, if they had wanted to assert it, they could have. There is an authorized representative exclusion in the policy. It was almost identical, if not entirely identical, to the authorized representative exclusion that was, in fact, an issue in Southern California counseling in a great American policy there. That was not raised by the insurers here. The authorized exclusion does not bar coverage. And I'll reserve the rest of my limited time for rebuttal. Thank you. Good morning. May it please the Court. My name is Stephan Dandelis with Kauffman Dalewich. I'll be arguing on behalf of the insurer defendants in this case, including Berkeley Insurance Company, who I directly represent, who is the primary insurer on a tower of insurance, where Great American, represented by Mr. Birch, they're going to follow the arguments. All the same issues apply. The only thing I'll point out for the benefit of Great American is as an excess insurer, they only would have any obligations whatsoever once the primary is exhausted. But all the issues that we're going to talk about here today apply equally to both. That's correct, Your Honor. Thank you. So, there's a lot to unpack from that. I kind of felt like counsel was making the arguments for us as it relates to reading in context, 1641, reading the policy as a whole. There's two exclusions that are at issue here. One that was determined by Judge Garnett to preclude coverage in full, the fraudulent instruction exclusion, D4D. You start from the premise, however, of what coverage is granted. What's the affirmative grant of coverage? The court found, did not find that there was coverage. The court found, the Ninth Circuit, sorry, the prior panel who addressed this, found that Cachet plausibly made an argument that A6A1 could be triggered. That's a fraudulent entry of electronic data into a computer system where that entry causes money to be transferred. That's just the front door. That's not the end of the analysis. Under California law, you have to look at all the exclusions, you have to read the policy as a whole. So you have, yes. Can you explain a hypothetical, any kind of situation that would have coverage under 6A1 without triggering the fraudulent instructions exclusion? Sure. Let's say there's a hacker who breaks into the system, breaks into Cachet's system, fraudulently inputs an approved vendor, fraudulently submits a vendor invoice, and fraudulently causes that invoice to be paid through their workday system or a similar account payable system. That fraudster, himself or herself, pushes the buttons, keystrokes in, through the fraudulent entry or change of data, and through those keystrokes, causes money to fly out the door. So wouldn't that be causing a financial institution to send money in a way that would trigger the exclusion? Well, it's not an instruction, number one, and it's not, the financial institution doesn't act on it. Those are self-executing transactions. I can go into my account and do an ACH. Chase doesn't have to do anything. I'm not interacting with anyone at Chase. They're not acting on an instruction. I haven't instructed someone to do something. I've done it myself. So in the hypothetical, the fraudster, him or herself, has done it without giving any instruction to anyone else. No one has acted on anything that the fraudster did. The fraudster did it him or herself. I can offer another example that even takes it outside. Let's say there was an instruction. Under D4D, the exclusion, it has to be an employer or financial institution that acts on the instruction. What if it's a payroll situation? And Judge Garnett touched on a few of these scenarios that say, it's not illusory because there's all kinds of other things that affect your business that may be outside of the upload of batch files. So in a payroll situation, and ironically, we're dealing with a payroll company who defrauded Cache. Most companies had a payroll company. Let's assume Cache had a payroll company. The fraudster who hacks into the system sets up three ghost employees and salaries and bonuses, communicates directly with the payroll company to cause payments to be made to those ghost employees. And those payments are made from the payroll company who acts on that instruction. That payroll company is neither an employee nor a financial institution. So it's outside the context of the exclusion and arguably would fall within A6A1, subject to all other terms, conditions, facts, et cetera. Of course, but they're umpteen examples of how you can have an A6A1 covered loss, a fraudulent entry of electronic data into a system. What that's for, as distinct from A6A2, which is the funds transfer portion of that insuring agreement, A6A1 is computer system fraud, a fraud upon the computer system. That's why there's a distinction. And this goes to the arguments that counsel is making. It's abundantly clear, excuse me, that when there's a fraudulent instruction, it's in quotes. If you look at the beginning of the policy under the page 1 of 14 of the form policy, it says words and phrases that appear in quotation marks have special meaning. It's intentional. In fact, this is a very well-written policy to make it abundantly clear that if there's an instruction to transfer money that proves to be fraudulent, you cannot find coverage under A6A1. Let me ask you this. You advanced two arguments with respect to the fraudulent instruction exclusion and also the authorized access exclusion. And the district court didn't reach the second exclusion. And I would assume you agree with me when I say that we could affirm the district court on either ground and we could affirm on the authorized access exclusion instead of the first one. Absolutely. Okay. Which exclusion do you think is the better argument that you have? Frankly, Judge Desai, I think they're both equally strong. And in this context, they work together. Again, back to reading everything as a whole. Cachet can't have it both ways. They can't say at the front door under A6A1 that there's been a fraudulent entry of electronic data into a computer system dot, dot, dot, dot, dot, dot by one of their customers who they gave the keys to the kingdom, but then say that it was not through authorized access. I agree. There is a difference between entry and access. Fraudulent entry. It's interesting when you look at that exclusion, the prefatory language is exactly the same. Under A6A1, the affirmative grant, fraudulent entry of electronic data into a computer system. Look at the exclusion. D4A. Loss resulting from what? Fraudulent entry of electronic data into a computer system. So it's a binary situation. If you have a fraudulent entry of electronic data into a computer system such that it would trigger, plausibly trigger coverage under the insuring agreement, it was either by someone who had authorized access to that system or someone who did not have authorized access to that system. What you heard counsel argue, and you'll see it in their briefs, they're contemplating that someone actually got into the server room and was keystroking in the hardware, in this internal. I think the term is internal. Let's look at the definition of computer system, also a defined term with quotes around it. It's not just the computers themselves. It says nothing about internal. In fact, what it says, computer system means systems and applications software and related communications networks by which electronic data is transmitted. That's why I'm asking this question, and I know you're saying that both arguments are equally as strong, but here there is a defined term we can go to understand what system means, which sounds contrary to the definition, I think, that your friend on the other side is advancing. And so in my view, the authorized access exclusion seems like the easier exclusion for you to be able to apply here. And I know that the district court went through the effort of dealing with the fraudulent instruction exclusion, but is it really your view that either apply equally and both are strong and there's less work to be done in terms of writing a decision that if you win on either one, which do you prefer to win? I could ask my client which they prefer to win. I don't think they I don't think they care which one they went on. They think either one applies and they truly do. And frankly, we wish the district court would have addressed both. I think the illusory coverage issue is is a closer call. And Judge Friedland asked you a question about when there would be coverage in an instance other than this one. And we only have to deal with the illusory coverage issue if we are deciding this case under the fraudulent instruction. I understand that. I understand that they have not argued anything is illusory about authorized access or unauthorized access. They're simply they're trying to raise an ambiguity as to what is access and trying distinction between entry and access. Entry is used in the conduct context of the electronic data itself. As you point out, the computer system definition is clear that it's not just internal. It's the communications. That's exactly what they did. They gave my payroll HR and iGreen access to the system to be able to enter things through a portal. So there's no illusory argument. But on that point, just to not, you know, lose sight of the fraudulent instruction, the mere possibility of some coverage, and I've already given two or three examples, there's nothing illusory about this. There's absolutely nothing illusory about it. It makes it abundantly clear through the use of funneling exclusions, which are normal. And there's no confusion about it. If you look at fraudulent instruction, it's a defined term. There's nothing. If I can, on the fraudulent instruction, let me just give a quick example. Two insuring agreements, just like here, you have A6A1 and A6A2. One covers the fraudulent entry. The other contemplates fraudulent instructions with an exclusion that says any instruction that proves to be fraudulent. If the first insuring agreement is, we will cover, we will indemnify loss arising from rotten food products. You have in insuring agreement two, we will ensure loss resulting from rotten fruit. The exclusion says, we will not cover loss resulting from any fruit that proves to be the second insuring agreement is a defined term. And it's defined to only be apples and oranges. But the claim is a claim for rotten bananas. It's pretty simple. No one would say that that's ambiguous or illusory. You get coverage for rotten apples and bananas. You don't get coverage, or sorry, apples and oranges. You don't get coverage for rotten bananas. That's how the A6A1, A6A2 read together with the fraudulent instruction insuring agreement works. It's not illusory at all. Authorized access, I agree. I wish Judge Garnett could have, but this is de novo review, as you know, and you can affirm on any ground. And that's why we've briefed and laid out clearly why they can't have it both ways. It can't both be a fraudulent entry of data into their computer system by someone that was authorized to make that entry, but not have access to the system to be able to make that entry. They can't have it both ways. So we think certainly the authorized access exclusion, D4-1, makes it abundantly clear that this is not a covered loss. And there is, I'll point out, also a funneling aspect to D4-1, except when covered under A6B, which is where an employee who would have authorized access receives a fraudulent instruction as defined from a computer software contractor. So it's contemplating. And if you look on pages, I believe it's 32 and 41 of our response brief, it boils down to pretty clear flow charts. It's a decision tree type analysis. If this, then this. If this, then this. It's not, first of all, Cachet is a sophisticated party and was represented by one of the world's largest brokers. They're not a lay person, but any lay person who can read, they would be charged with having the obligation to read the policy. There's no dispute. I want to ask you a couple of questions about this illusory coverage principle. Yes. My understanding from reading the California case law is that the California Supreme Court has never actually adopted that doctrine, even though it's had the opportunity to do so. I'm sorry, could you repeat that? So my question is, reading California's case law, I don't think that the California Supreme Court has adopted the illusory coverage doctrine. It seems like it has had the opportunity to do so and it has not. So in terms of our job of trying to faithfully apply whatever California law is without really commenting one way or another, what do we make of that? What do we do with that? Well, there are appellate court cases and district court cases that give parameters around what they expect the California Supreme Court would do with the concept of illusory. Every case site... Isn't the most recent pronouncement from the California Supreme Court basically saying, we're not adopting this, but even if we did, here's some thoughts we'd have about it. What are we supposed to make of that? I think that would not be... To the extent the California Supreme Court has not made a pronouncement on it and they've just given an indication, the case law that is of record, that gives the best indication of what the California Supreme Court would do because it's already been decided and it's not dicta in any case, is that the mere possibility of any coverage. It doesn't have to cover what they want it to cover, it just has to cover something. There's plenty that can be covered. The policy, again, to the flow chart, it's clear what it does cover because it points you direct... It makes it so easy. If there's a fraudulent instruction involved, look here. If it's an instruction that proves to be fraudulent, you may not look here. If it's employee dishonesty, employee theft, you have to look here. It gives a step-by-step guide that any layperson who can read the words on paper would be able to follow. There's nothing confusing or illusory about it. Yes. So John Skrill came up both in Judge Garnett's opinion, which wasn't briefed before that. It came up, it was briefed before you on appeal. What Judge Garnett did was anticipated an argument that they didn't even make. They never even made the argument that there was an ambiguity. She went through that analysis and said, there's nothing ambiguous about it. It's abundantly clear what it is. And even if it wasn't, there's nothing illusory about it because you can have all different types of coverage. It doesn't have to cover this claim. It doesn't have to cover what you want it to cover. In terms of expectations... I'm sorry. Okay. I need to cut you off because That's okay. Thank you. I think we had about a minute left for rebuttal. I think that minute was about right. Briefly for the Court, we hear a lot about from the opposing counsel reference, you know, ways in which Cachet's interpretation may not have been reasonable, ways in which it should have been done. But what I have not seen in the briefing is what exactly their interpretation is of instruction, what exactly their interpretation is of instruction that proved to be fraudulent. And this is somewhat a problem because they discuss all of their different ways in which there are examples in which, you know, there could be coverage under computer fraud. The payroll payments, that involves a financial transaction, involves a financial institution. You know, anything that they have provided in terms of their examples all involve processing through a financial institution. So it's hard to see where they could have a reasonable interpretation other than the one that Cachet presented. With respect to the authorized access exclusion, two brief points. First, the exclusion says that there is, if there's fraudulent entry, references both fraudulent entry and authorized access. Entry and access cannot mean the same thing here. And I may have been a little bit flipped when I mentioned what the access to computer system would be. I'm not talking about actually going around digging around the servers, going into a server room, unclipping wires, that kind of thing. What I'm talking about is the ability to actually go manipulate code, manipulate internal items in the system. There's a destruction of electronic programs endorsement, I believe, in the policy that actually contemplates going inside, potential hacking internally in the system. That is more of a line of what access would be in this instance. Thank you. Thank you for the helpful arguments. This case is submitted.
judges: FRIEDLAND, FORREST, DESAI